No. 25-01150

# United States Court of Appeals for the Seventh Circuit

**JORDAN PENLAND, et al.,**
*Plaintiffs – Appellants*,

**v.**

**CHICAGO PARK DISTRICT and ASM GLOBAL,**
*Defendants – Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 21-cv-05581 (Hon. LINDSAY C. JENKINS)

## BRIEF OF APPELLANTS


JOHN E. DROSICK
*Counsel of Record*
TERRENCE J. DEE
SAMUEL M. ZUIDEMA
VERONICA J. SOTOS
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
(312) 558-5600

*Counsel for Appellants*


JULY 31, 2026

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-01150

Short Caption: Jordan Penland, et al. v. Chicago Park District, et al.

[ X ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jordan Penland, Karl Garner, Edward R. Burke, Paul C. Burke

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Collins & Collins; Schoenberg Finkel Beederman Bell & Glazer, LLC; Winston Taylor LLP

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Terrence J. Dee Date: July 31, 2026

Attorney's Printed Name: Terrence J. Dee

Counsel of Record: Yes _____ No X **[NEW]**

Address: Winston Taylor LLP, 300 N. LaSalle Drive, Chicago, IL 60654 **[NEW]**

Phone Number: (312) 558-5600 Fax Number: (312) 558-5700

E-Mail Address: Terry.Dee@winstontaylor.com **[NEW]**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-01150

Short Caption: Jordan Penland, et al. v. Chicago Park District, et al.

[X] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(4) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jordan Penland, Karl Garner, Edward R. Burke, Paul C. Burke

(5) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Collins & Collins; Schoenberg Finkel Beederman Bell & Glazer, LLC; Winston Taylor LLP

(6) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ John E. Drosick Date: July 31, 2026

Attorney's Printed Name: John E. Drosick

Counsel of Record: Yes X No ___ **[NEW]**

Address: Winston Taylor LLP, 300 N. LaSalle Drive, Chicago, IL 60654 **[NEW]**

Phone Number: (312) 558-5600 Fax Number: (312) 558-5700

E-Mail Address: John.Drosick@winstontaylor.com **[NEW]**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-01150

Short Caption: Jordan Penland, et al. v. Chicago Park District, et al.

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(7) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jordan Penland, Karl Garner, Edward R. Burke, Paul C. Burke

(8) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Collins & Collins; Schoenberg Finkel Beederman Bell & Glazer, LLC; Winston Taylor LLP

(9) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Samuel M. Zuidema Date: July 31, 2026

Attorney's Printed Name: Samuel M. Zuidema

Counsel of Record: Yes _____ No ___X

Address: Winston Taylor LLP, 300 N. LaSalle Drive, Chicago, IL 60654

Phone Number: (312) 558-5600 Fax Number: (312) 558-5700

E-Mail Address: Sam.Zuidema@winstontaylor.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-01150

Short Caption: Jordan Penland, et al. v. Chicago Park District, et al.

[ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(10) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jordan Penland, Karl Garner, Edward R. Burke, Paul C. Burke

(11) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Collins & Collins; Schoenberg Finkel Beederman Bell & Glazer, LLC; Winston Taylor LLP

(12) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

---

Attorney's Signature: s/ Veronica J. Sotos Date: July 31, 2026

Attorney's Printed Name: Veronica J. Sotos

Counsel of Record: Yes _____ No ___X

Address: Winston Taylor LLP, 300 N. LaSalle Drive, Chicago, IL 60654

Phone Number: (312) 558-5715 Fax Number: (312) 558-5700

E-Mail Address: veronica.sotos@winstontaylor.com

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** .......... 1

**JURISDICTIONAL STATEMENT** .......... 5

**STATEMENT OF THE ISSUES** .......... 6

**STATEMENT OF THE CASE** .......... 6

I. The chant is a homophobic slur that has long plagued professional soccer. .......... 6

II. Plaintiffs warn Defendants that the chant is likely to occur, and their request for help is promptly denied. .......... 7

III. The chant occurs at the match at least 28 times—and Defendants do nothing about it. .......... 12

IV. The district court rejects Plaintiffs' discrimination claim at summary judgment. .......... 15

**SUMMARY OF THE ARGUMENT** .......... 18

**ARGUMENT** .......... 21

I. The district court erred in granting Defendants summary judgment because it applied the wrong standard for the "less favorable treatment" element of Plaintiffs' claim. .......... 22

A. The district court erred in requiring that Plaintiffs present evidence of a "directly comparable" person whom Defendants in fact treated differently. .......... 22

B. Had the district court properly considered all the evidence, it would have denied Defendants' motion for summary judgment. .......... 31

II. Even if the district court properly required comparator evidence, it still misapplied the standard in granting Defendants summary judgment. .......... 33

A. Defendants' testimony about how they would have responded to racial discrimination shows that Defendants treated Plaintiffs differently on account of sexual orientation. .......... 33

B. The district court disregarded other substantial comparator evidence of discrimination. .......... 35

III. The district court erred in denying Plaintiffs' motion for summary judgment .......... 38

**CONCLUSION** .......... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. CLP Corp.*,
460 F. App'x 845 (11th Cir. 2012) ............ 24

*Blow v. Bijora, Inc.*,
855 F.3d 793 (7th Cir. 2017) ............ 22

*Brooks v. Collis Foods, Inc.*,
365 F. Supp. 2d 1342 (N.D. Ga. 2005) ............ 24

*Callwood v. Dave & Buster's, Inc.*,
98 F. Supp. 2d 694 (D. Md. 2000) ............ 25, 26

*Christian v. Wal-Mart Stores, Inc.*,
252 F.3d 862 (6th Cir. 2001) ............ 3, 19, 23, 24, 29, 30, 31

*Coleman v. Donahoe*,
667 F.3d 835 (7th Cir. 2012) ............ 20, 35, 36, 37, 38

*Darr v. WRB Ref. LP*,
2019 WL 2338507 (S.D. Ill.) ............ 29

*David v. Board of Trustees of Cmty. College District No. 508*,
846 F.3d 216 (7th Cir. 2017) ............ 29

*Ellis v. Dept. of Hum. Rts.*,
2020 WL 1082614 (Ill. App.) ............ 28

*Ellis v. Ill. Hum. Rts. Comm'n*,
2020 WL 2395615 (Ill. App.) ............ 28

*Fuller v. McDonough*,
84 F.4th 686 (7th Cir. 2023) ............ 23, 25, 27

*Good v. Univ. of Chi. Med. Ctr.*,
673 F.3d 670 (7th Cir. 2012) ............ 31, 39

*Hagen v. Fond Du Lac Sch. Dist.*,
2024 WL 1303331 (E.D. Wis.) ............ 29

*Humphries v. CBOCS West, Inc.*,
474 F.3d 387 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008) ............ 20, 35

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*,
988 F.3d 948 (7th Cir. 2021) .......... 29

*Jannsen v. Caine Transfer, Inc.*,
2025 WL 2506887 (W.D. Wis. Sept. 2, 2025) .......... 29

*Johnson v. Rimmer*,
936 F.3d 695 (7th Cir. 2019) .......... 21

*Kelly v. Project of the Quad Cities, Inc.*,
2021 WL 1566444 (C.D. Ill.) .......... 29

*Lindsey v. SLT Los Angeles, LLC*,
447 F.3d 1138 (9th Cir. 2006) .......... 24

*M.U. by and through Kelly U. v. Team Illinois Hockey Club, Inc.*,
240 N.E.3d 446 (Ill. 2024) .......... 4, 23, 30

*McCoy v. Homestead Studio Hotels*,
390 F. Supp. 2d 577 (S.D. Tex. 2005) .......... 19

*McGrath v. Dunecrest Condo. Ass'n*,
2024 WL 2373391 (N.D. Ind.) .......... 29

*Morgan v. SVT, LLC*,
724 F.3d 990 (7th Cir. 2013) .......... 29

*O'Neill v. Gourmet Sys. of Minnesota, Inc.*,
213 F. Supp. 2d 1012 (W.D. Wis. 2002) .......... 24

*Ortiz v. Werner Enters., Inc.*,
834 F.3d 760 (7th Cir. 2016) .......... 3, 19, 23, 28, 29, 31, 38

*Palmer v. Indiana Univ.*,
31 F.4th 583 (7th Cir. 2022) .......... 29

*Phelps v. Ivy Tech Cmty. Coll. of Indiana*,
2024 WL 1056149 (S.D. Ind.) .......... 29

*Sangamon Cnty. Sheriff's Dept. v. Ill. Hum. Rts. Comm'n*,
908 N.E.2d 39 (Ill. 2009) .......... 23

*Stilwell v. Am. Gen. Life Ins. Co.*,
555 F.3d 572 (7th Cir. 2009) .......... 38

*Stone v. City of Indianapolis Pub. Utilities Div.*,
281 F.3d 640 (7th Cir. 2002) .......... 21, 38, 39

*Straw v. Illinois State Bd. of Elections*,
2020 WL 5536728 (Ill. App.) .......... 19, 27, 28

*Tolan v. Cotton*,
572 U.S. 650 (2014) .......... 21

*Wachuku v. Jet Blue Airways Corp.*,
2021 WL 4497497 (C.D. Cal.) .......... 24

*Ward v. Rush-Presbyterian St. Luke's Med. Ctr.*,
1986 WL 7355 (N.D. Ill.) .......... 32

*Whitmore v. Wheaton Vill. Nursing & Rehab. Ctr., LLC*,
2022 WL 1422754 (N.D. Ill.) .......... 29

**Statutes**

775 ILCS 5/1-103(Q) .......... 16

775 ILCS 5/5-102(A) .......... 15

28 U.S.C. § 1291 .......... 5

28 U.S.C. § 1332 .......... 5

42 U.S.C. § 1981 .......... 25

**Other Authorities**

Fed. R. Civ. P. 56(a) .......... 21

## INTRODUCTION

Plaintiffs Jordan Penland, Karl Gerner, Paul Burke, and Ted Burke are U.S. soccer fans who wanted to enjoy a match at Soldier Field. Three of them are gay, the other is an ally of the LGBTQ+ community, and all four are acutely aware of the homophobia that has often deterred and excluded gay men from participating in sports. So, several days before arriving at Soldier Field in pride-themed U.S. Soccer jerseys to watch the 2019 Gold Cup Final between the U.S. and Mexico national teams, Plaintiffs contacted each Defendant—the entities that own and operate Soldier Field—to seek assurances that Defendants would address a notorious homophobic chant often shouted by fans of Mexico's team. The chant—*¡eeeh puto!*—is commonly understood as a Spanish-language equivalent of the English-language slur "faggot." And that is precisely the kind of "profane, disruptive, or abusive language" prohibited by Soldier Field's Code of Conduct.

But Defendants chose not to treat LGBTQ+ discrimination at Soldier Field in the same way they treat other discriminatory behavior by fans. And that decision resulted in precisely what Plaintiffs feared: The homophobic chant thundered throughout Soldier Field no less than 28 times during the game. Patrons also hurled the slur at Plaintiffs individually. In the moment, Plaintiffs again asked that Defendants try to stop the homophobic verbal abuse that threatened their dignity and safety—and again, Defendants chose to deny Plaintiffs' requests for security services, even while providing those services to others who faced racist or sexist language. In that way, Defendants' informed, discriminatory choices permitted LGBTQ+ hostility to overtake the largest and most iconic stadium in

Illinois. And rather than enjoy the match as they had hoped, Plaintiffs spent hours enduring the very indignity and threats to their personal safety that they had repeatedly asked Defendants to prevent.

The Illinois Human Rights Act provides a remedy for precisely this kind of discrimination in public accommodations. But the district court here erected an artificial barrier that few plaintiffs could ever surmount in the public accommodations context. According to the district court, Plaintiffs' discrimination claim could not survive summary judgment, as a matter of law, because Plaintiffs did not identify "a similarly situated individual," "directly comparable to [Plaintiffs] in all material respects," whom Defendants treated more favorably. SA06. Under this standard, the court disregarded Defendants' own admissions that they treat racist language differently from homophobic language:

> **Q.** Would you consider a homophobic chant to violate the code of conduct?
>
> **A.** Yeah, I don't know.
>
> * * *
>
> **Q.** Okay. What about a racist chant? Would that be profane, disruptive, or abusive?
>
> **A.** Yes.

A158 (testimony of Soldier Field's General Manager); *see also* A143 (opinion of Defendants' expert that "verbal discrimination to a gay patron at Soldier Field is not an actual safety concern"). The court also disregarded evidence of three separate incidents, including one at the same event, where Defendants removed patrons for using racist or sexist language in violation of the Code. And the court focused solely on the stadium-wide chant without acknowledging that Plaintiffs also

requested security services in response to fans who targeted them specifically. None of this matters, said the district court, because Plaintiffs did not prove that a straight person complained about the homophobic chant—or that anyone complained about a sufficiently comparable "racist chant"—and that Defendants treated those patrons more favorably. SA07.

Other courts have rejected the need for this kind of strict, like-for-like comparator evidence in the public accommodations context. *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001). This Court should too. Under ordinary summary-judgment principles, "the sole question that matters" is "[w]hether the evidence would permit a reasonable factfinder to conclude that" Plaintiffs were discriminated against because of their actual or perceived sexual orientation. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016). While it might make sense to require strict comparator evidence "[i]n the employment context" (SA06), where the plaintiff has ready access to a relatively small and identifiable pool of comparable employees, such a requirement would functionally immunize discrimination in the public accommodations setting, where "the clientele is 'largely itinerant' and the task of producing similarly situated persons outside the protected group is much more difficult" (*Christian*, 252 F.3d at 871 (citation omitted)). This Court should reject a rule that would require public accommodations plaintiffs to identify a mirror-image incident to prove discrimination.

Even if this Court does not set aside the district court's "comparator evidence" requirement altogether, it should still reverse because Plaintiffs' evidence satisfies any such requirement when properly applied to the public accommodations setting. "As remedial legislation, the [Illinois Human Rights] Act must be liberally construed to achieve its purpose—here, the prevention of unlawful discrimination in public accommodations for all individuals." *M.U. by and through Kelly U. v. Team Illinois Hockey Club, Inc.*, 240 N.E.3d 446, 453 (Ill. 2024). There is nothing "liberal" about construing the statute narrowly to require Plaintiffs to find a needle in a haystack—a needle that might not even exist—just to get past summary judgment. And given the abundant evidence of disparate treatment here, including Defendants' admissions that they would treat a racist chant differently than a homophobic one, a reasonable jury could conclude that Defendants discriminated against Plaintiffs because of their actual or perceived sexual orientation.

In fact, *any* reasonable jury would conclude that Defendants discriminated against Plaintiffs on that basis. The uncontroverted evidence puts it beyond dispute. For that reason, the district court erred not only in granting summary judgment to Defendants but also in denying summary judgment to Plaintiffs. The Court should thus reverse and remand with instructions to enter judgment for Plaintiffs as a matter of law. At a minimum, though, Plaintiffs are entitled to present their case to a jury.

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Illinois had jurisdiction of this case under 28 U.S.C. § 1332 because the sum in controversy exceeds the statutory minimum of $75,000 and the matter is between citizens of different states. Plaintiffs Jordan Penland and Karl Gerner are citizens of Washington, Edward ("Ted") Burke is a citizen of Idaho, and Paul Burke is a citizen of Utah. Defendant Chicago Park District ("CPD") is a municipal corporation and political subdivision organized under Illinois law and is a citizen of Illinois. Defendant ASM Global is a limited liability company whose sole member is ASM Global Holdings, LLC. ASM Global Holdings, LLC is a limited liability company whose sole member is SMG US Midco 3, LLC. SMG US Midco 3, LLC is a limited liability company whose sole member is SMG US Midco 2, Inc. SMG US Midco 2, Inc. is a corporation incorporated in Delaware with its principal place of business in Pennsylvania. Thus, Defendant ASM Global is a citizen of Delaware and Pennsylvania.

This appeal is taken from the final judgment entered by the district court on December 31, 2024 (SA09), which disposed of all claims with respect to all parties by granting Defendants' motion for summary judgment and denying Plaintiffs' motion for summary judgment. Plaintiffs timely filed their notice of appeal on January 28, 2025. Dkt. 168. This Court has jurisdiction to decide this appeal under 28 U.S.C. § 1291 because the appeal is of a final judgment entered by the United States District Court for the Northern District of Illinois.

## STATEMENT OF THE ISSUES

1. Whether the district court applied the wrong legal standard in granting summary judgment to Defendants by adopting a rule requiring plaintiffs in public accommodations cases to identify a person who was directly comparable in all material respects and who was treated more favorably by the defendant, rather than considering all of the evidence to determine whether a reasonable jury could find that the defendant discriminated against the plaintiff because of his protected status, as required by this Court's precedent under the Illinois Human Rights Act.

2. Whether, even if comparator evidence is required, the district court erred in concluding that Plaintiffs failed to present sufficient evidence to create a genuine dispute of material fact where Defendants admitted that they would have responded differently to comparable racist misconduct and enforced their Code of Conduct against comparable language-based violations.

3. Whether the district court erred in denying Plaintiffs' motion for summary judgment where the undisputed evidence establishes that Defendants intentionally discriminated against Plaintiffs because of their actual or perceived sexual orientation.

## STATEMENT OF THE CASE

### I. The chant is a homophobic slur that has long plagued professional soccer.

For more than a decade, fans of Mexico's national soccer team have been chanting *¡eeeh puto!* at soccer matches. As Plaintiff Jordan Penland testified, *puto* is used as a "slur [like] the word fag, as we would use it in English, or faggot, and

can also mean male sex worker in Spanish." A080. Plaintiffs' linguistic and sociolinguistic expert similarly explained in unrebutted testimony that the word *puto* is one of "the most demeaning slurs used in Latin America today, equivalent in expressive impact to the English slurs faggot or N-word." Dkt. 147-33 at 10, 20.

The chant has long been a scourge on professional soccer and has drawn extensive media coverage over the years. It is "notorious and infamous across the soccer world." Dkt. 147-13 at 41:23–32:13. Particularly as a group activity, the chant dehumanizes the targeted gay men and increases the risk of physical violence. Dkt. 147-34 at 27; Dkt. 147-13 at 82:3–9. National and international soccer and sport organizations unanimously agree. FIFA (the international governing body in soccer), CONCACAF (the regional governing body in soccer), Major League Soccer (the domestic soccer league of the United States), the Mexican Football Federation (Mexico Men's National team's governing body), and the Court of Arbitration for Sport (an international body that adjudicates disputes in sports) all denounced the chant as homophobic long before this case arose. *See* Dkt. 147 ¶ 14 n.1 (collecting articles). And the Mexican Football Federation has been repeatedly subjected to disciplinary actions for its failure to curtail this hateful and harassing language. *See, e.g.*, Dkt. 147-49, -51, -53, -55, -56 (supporting articles).

## II. Plaintiffs warn Defendants that the chant is likely to occur, and their request for help is promptly denied.

Plaintiffs U.S. Navy Lt. Cmdr. Jordan Penland, Karl Gerner, Paul Burke, and Ted Burke are lifelong soccer fans and avid supporters of the U.S. Men's National Team. A057–58, A069, A079, A092. Jordan, Karl, and Paul are gay.

A066, A080, A093. Ted is straight, but he can be perceived as gay when associating with a group of gay men and wearing a U.S. Soccer jersey with rainbow numbering. A053–52.

The four purchased tickets to attend the 2019 CONCACAF Gold Cup Final at Soldier Field in Chicago, eager to watch the next chapter in the longtime rivalry between the U.S. and Mexico in the championship match of the premier tournament for national teams of North America, Central America, and the Caribbean. A069. Unfortunately, the Mexico National Team also brought with it a concern unrelated to its play on the pitch: the chant.

Plaintiffs were no strangers to the chant. Jordan, a Latin-American man who grew up in San Antonio, had been taunted with the chant during childhood. A080. And Paul, Ted, and Karl had been subjected to it during two previous soccer matches: Paul and Ted were physically assaulted at a 2015 Gold Cup match after enduring the chant throughout the game (A056, A070), and dozens of Mexico national fans aimed the chant at Karl and Paul at a 2017 match (A094). With these experiences in mind, Plaintiffs had good reason to fear being taunted with the chant again. So they decided to be proactive.

Four days before the match, Paul sent separate but identical messages to Defendants CPD and ASM Global—the owner and operator of Soldier Field, respectively. A067, A152 (pre-match email). He provided a thorough history of the chant, explaining that it has been a "scourge to international soccer over the last decade." A152. He expressed concern that it would disrupt his enjoyment of the

game, denigrate his dignity as a human being, and (worse yet) put him and his friends in serious danger. *Id.* And he requested that Defendants "make all necessary preparations" to prevent the chant from occurring. *Id.*

Paul explained to Defendants that CONCACAF (the lessee of Soldier Field) had "persistent[ly] fail[ed] to prevent and stop homophobic and discriminatory fan misconduct both during the 2019 Gold Cup and at CONCACAF-sponsored events over the last decade." *Id.* Paul even directed Defendants to review "telecasts from recent matches involving Mexico during the 2019 Gold Cup." *Id.* Paul also warned Defendants that the chant would run afoul of their own Code of Conduct (*id.*), which prohibited fans from using "profane, disruptive, or abusive language" (A146 (Soldier Field Code of Conduct)). ASM Global and its subcontractor Monterrey Security were responsible for enforcing the Code, and violations could range from a warning to an ejection to civil and criminal actions. A146, A129–30, A157, A138.

Simply put, Paul's message included more information than Defendants could have possibly needed to prepare appropriate security services and ensure that Soldier Field—the largest place of public accommodation in Illinois—remained a safe and welcoming place for its LGBTQ+ patrons.

Unfortunately, Paul's requests fell on deaf ears. Far from taking proactive steps to address the known security concerns posed by the chant, Defendants chose to take no action to protect LGBTQ+ patrons. Kevin Walsh, an ASM Global assistant general manager of Soldier Field, simply forwarded the email to four other ASM Global employees (none of whom was responsible for security) and to outside

counsel—and that was it. A124–25, A103; Dkt. 147-36 ¶¶ 4–5. Defendants' expert agreed that wasn't enough. A141–42. Outside counsel never responded, and nobody at ASM Global bothered to follow up in any way. Dkt. 147-36 ¶¶ 10–11; A128. ASM Global admits that receiving this kind of email was "rare," yet no one so much as discussed the issue, internally or externally. A126, A134. Nor did anyone reach out to discuss the chant with CONCACAF or any of its agents at Major League Soccer or Soccer United Marketing. Dkt. 147-38 ¶ 7.

The reason for the inaction is now clear: Defendants were unwilling to acknowledge that the homophobic chant violated their Code of Conduct. The corporate representatives for CPD, ASM Global, and Monterrey Security all later confirmed their unwillingness to characterize the chant as "profane, disruptive, or abusive language":

- When CPD's corporate representative was asked if "the 'eeeh puto' chant is a homophobic slur," she responded, "I do not know how to answer that on behalf of CPD and say what a word means; CPD does not have a position on whether 'puto' is a homophobic slur." A089.
- When ASM Global's corporate representative was asked whether he would "consider a homophobic chant to violate the code of conduct," he responded, "Yeah, I don't know." A158.
- Monterrey Security's corporate representative simply declared that the company "would not assert any type of opinion or viewpoint on any of those matters." A112–13.

In other words, Defendants and their security provider refused to classify the chant—an equivalent to the slur "faggot"—as "profane, disruptive, or abusive language," contrary to the Mexican Soccer Federation and every other major entity involved in professional soccer. At the same time, though, Defendants had no

problem admitting that a racist chant would be "profane, disruptive, or abusive language." A158; *see* A115. The testimony of ASM Global's Tim LeFevour, the General Manager of Soldier Field, best demonstrates this disturbing dichotomy:

> **Q.** Would you consider a homophobic chant to violate the code of conduct?
>
> **A.** Yeah, I don't know.
>
> * * *
>
> **Q.** Okay. What about a racist chant? Would that be profane, disruptive, or abusive?
>
> **A.** Yes.

A158.

What's more, Defendants had every opportunity to prepare a response to the chant ahead of the July 7 game—had they wanted to. On July 6, three days after receiving Paul's email, ASM Global had an "all-hands" meeting with the key stakeholders for the match. A127–28; A101. The Monterrey Security employees responsible for providing security attended this meeting to be briefed on potential security concerns. A127–28. Kevin Walsh was there too—the recipient of Paul's email. A101. But Walsh chose not to share Paul's concerns about the homophobic chant with the group or educate the security personnel. *Id.* Indeed, nobody raised the subject of the chant at all. *Id.*; A127–28. And Monterrey Security's corporate representative later admitted that its English-speaking employees working the game "might have no idea what's going on" without proper training on the chant. A113–14. Because of Defendants' decision not to acknowledge the homophobic chant as a violation of the stadium's Code of Conduct—let alone to prepare an action plan for the impending threat to LGBTQ+ patrons—these Monterrey

Security employees were kept in the dark. And it's no mystery why Defendants made this decision: because, according to Defendants' expert, LGBTQ+ discrimination is not a safety concern:

> **Q.** . . . So you're going to tell the jury that in your expert opinion gay verbal discrimination to a gay patron at Soldier Field is not an actual safety concern, correct?
>
> **A.** Yes.

A143.

Incredibly, while Defendants made no security plans to address the *homophobic* chant, another ASM Global assistant general manager, Marty McAndrew, admitted that Defendants would have reacted very differently to messages warning of a mass *racist* chant—by forwarding the messages to security or the police, for example. A107–08. They also had no trouble determining that the N-word would constitute "profane, disruptive, or abusive language" in violation of the Code. A158, A115. In fact, Defendants admitted that they would have taken action had fans started a racist chant specifically at the Gold Cup Final. A103, A071–72, A119–20.

## III. The chant occurs at the match at least 28 times—and Defendants do nothing about it.

As Plaintiffs feared, the chant occurred within the first minute of the match. Dkt. 147-17 (video of match). Plaintiffs felt it acutely; the rainbow numbers on their jerseys might as well have been targets on their backs for the 62,493 attendees, mostly consisting of Mexico fans. A059, A095–96, A081–82. As the match progressed, Mexico fans aimed the chant at Plaintiffs specifically. A055,

A083, A085, A097, A064–65. Jordan testified that "in the immediate aftermath of a unified chant there were definitely times where fans of the opposing team would—that were sitting in our vicinity would repeat it again and again and point and say Puto towards us because we were sitting there." A083. And as things intensified on the pitch, so they did in the stands. Plaintiffs felt increasingly unsafe as the potential for violence escalated. A074, A061, A085. As Plaintiffs' sociolinguistic expert explained, their "feelings of intense abjection and fear of danger" were "consistent with the scholarly literature on the power of slurs on those targeted"; when a minority group becomes sub-human, the dominant masses often treat them physically as such. Dkt. 147-34 at 4.

Plaintiffs continued to seek help throughout the match, to no avail. They first tried sending a text message to the Soldier Field security number, which is published on the website and the stadium videoboards so fans can bring security-related questions or concerns to the attention of security personnel. Dkt. 147-27 (text message); Dkt. 147-36 ¶ 23. The message never got to the right people because, as it turns out, the number posted on the website and around the stadium was wrong, and Defendants had never bothered to correct it. Dkt. 147-36 ¶ 25; A124. As a result, rather than receiving security assistance from Defendants, Plaintiffs received two middle fingers:




Dkt. 147-27.

Having no luck with the security number, Paul and Karl next spoke to a security officer in their section at halftime. A060, A084, A075. They told the officer that they felt threatened by the chant and were disappointed that nothing was being done to address it. A073. But the security official did not address the issue or escalate it up the chain of command. Instead, he explained that he *would* do something if the chant were racist. A071–72.

Suffice it to say, because Defendants were unwilling to characterize the homophobic slur as "profane, disruptive, or abusive language" and apparently did not view it as "an actual safety concern" (A143), they did not enforce the Code of Conduct against a single chant participant at the 2019 Gold Cup Final—even while

enforcing the Code against other abusive language at the same event. A132–33 (ASM Global admitting that at least one fan was ejected in the 2019 Gold Cup Final solely for "profane, disruptive, or abusive language"). Indeed, Defendants have enforced the Code against racist and sexist language at other events at Soldier Field. A131; Dkt. 147-32, 147-33 (incident reports showing that Defendants ejected a patron who called another patron a "Bitch ass nigga" and ejected a male attendee for "making sexual comments" to a female).

As a result of Defendants' discriminatory conduct, the chant reverberated throughout Soldier Field so loudly that it can be heard on the broadcast of the match at least 28 times. Dkt. 147-36 ¶ 27; Dkt. 147-17 (video of match). Of course, the broadcast does not capture the slurs thrown specifically at Plaintiffs. And because Defendants decided that a homophobic slur does not warrant a security response, Plaintiffs were deprived of their legal right to enjoy one of the most preeminent places of public accommodation in Illinois without being degraded, dehumanized, and threatened.

## IV. The district court rejects Plaintiffs' discrimination claim at summary judgment.

Plaintiffs sued CPD and ASM Global for violating the Illinois Human Rights Act (IHRA), which prohibits "any person on the basis of unlawful discrimination" from "deny[ing] or refus[ing] to another the full and equal enjoyment of the facilities, goods, and services of any place of public accommodation." Dkt. 84 (Second Am. Compl.); 775 ILCS 5/5-102(A). "Unlawful discrimination" is defined to

include "discrimination against a person because of his or her actual or perceived . . . sexual orientation." 775 ILCS 5/1-103(Q).

Both Plaintiffs and Defendants moved for summary judgment. Dkt. 142, 145. Plaintiffs argued that they established all the elements required to make out a prima facie case of discrimination under the IHRA: (1) they are members of a protected class, (2) they sought to exercise the right to full benefits and enjoyment of a place of public accommodation, (3) they were denied those benefits and enjoyment, and (4) they were treated less favorably than similarly situated persons outside their protected class. *See* Dkt. 146. Defendants, for their part, argued that Plaintiffs had failed to establish only the last two elements—that Plaintiffs were denied any benefits or enjoyment or that they were treated less favorably than similarly situated others. *See* Dkt. 143. Defendants also argued that Plaintiffs' theory would restrict Mexico fans' First Amendment free speech rights. *See* Dkt. 143, 153.

The district court granted summary judgment to Defendants. SA08. The court swiftly rejected Defendants' First Amendment theory because "[t]he goods and services at issue in this case are not expressive in nature, placing them beyond the ambit of cases involving public accommodation and Free Speech." SA08 at n.6. And as for Plaintiffs' IHRA claim, the court ruled that Plaintiffs had satisfied the first three elements: it was undisputed that Plaintiffs (1) are members of a protected class and (2) attempted to exercise the right to enjoy Soldier Field, and the court agreed with Plaintiffs that there was no genuine dispute that they (3) were denied

that right when Defendants failed to provide security services. SA06 ("Given these undisputed facts, Plaintiffs have demonstrated that they requested but were denied security services and that security was a preexisting service Defendants provided.")

On the final element, however, the court ruled that Plaintiffs had not presented sufficient evidence that they were treated less favorably than similarly situated persons outside of their protected class. SA08. The court did not address—but implicitly rejected—Plaintiffs' argument that evidence of a specific "comparator" is not required in public accommodations cases. Instead, the court looked to "the employment context," where a plaintiff must identify a "similarly situated individual" who is "directly comparable to [the plaintiff] in all material respects." SA06. The court correctly noted that this is supposed to be a "flexible, common-sense, and factual" inquiry, without any "mechanical magic formula." *Id.* But in evaluating Plaintiffs' evidence, the court set an exceptionally high bar.

First, the court determined that the testimony from Defendants' employees about how they would have responded to a mass *racist* chant "is not evidence that Defendants treated similarly situated patrons more favorably." SA07. The court found this evidence to be "at best hypothetical" and said that "the hypothetical comparison [does not] eliminate other important variables, such as the circumstances surrounding a racist chant or demonstration, which are needed to isolate discriminatory intent." *Id.* "Ultimately," the court could "[]not see how Plaintiffs' hypothetical comparison satisfies the burden to identify a similarly situated actor outside of the protected class who received more favorable treatment"

because Plaintiffs did not identify (1) "anyone of a different sexual orientation who raised concerns about the [homophobic] Chant but received a better response" or (2) "any individual or group of individuals who requested security services in response to a similar demonstration at a similar event but who received more favorable treatment or a better response." *Id.*

Second, the court determined that the three specific individuals Plaintiffs *did* identify who were removed from Soldier Field for language-based Code violations were "too factually distinct to allow for meaningful comparison." SA07–08. The court reasoned that "the circumstances of the Chant" distinguished Plaintiffs' situation from the other incidents, presumably because those incidents involved only one or two violators. SA08 ("Neither incident involved anything resembling conduct like the Chant."). The court never grappled with any of the other evidence in the record.

With that, the court concluded that Plaintiffs had "not established evidence from which a jury could reasonably find the fourth prima facie requirement for a public accommodation claim." *Id.* On that basis, the court granted Defendants' summary-judgment motion and denied Plaintiffs'. *Id.*

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court for three reasons.

***First***, the district court erred in granting Defendants' motion for summary judgment because the court misapplied the Illinois Human Rights Act by strictly requiring proof that a similarly situated individual, "directly comparable to the plaintiff in all material respects," was actually treated more favorably by

Defendants. *See infra* at 22–32. Whatever its merits in the employment discrimination context, such a requirement does not fit the public accommodations setting, where "the clientele is 'largely itinerant,' and the task of producing similarly situated persons outside the protected group is much more difficult." *Christian*, 252 F.3d at 871 (citation omitted). And in *Ortiz*, this Court did away with "the rat's nest of surplus 'tests'" in discrimination cases, clarifying that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d at 766. Following *Christian* and consistent with *Ortiz*, this Court should hold that providing direct comparator evidence is just one way—not the only way—a public accommodations plaintiff can show that "he was treated less favorably than similarly situated persons outside of his protected class." *Straw v. Illinois State Bd. of Elections*, 2020 WL 5536728, at *6 (Ill. App.) (citing *McCoy v. Homestead Studio Hotels*, 390 F. Supp. 2d 577, 583–85 (S.D. Tex. 2005)).

***Second***, even if the district court did not err in requiring comparator evidence, it erred in disregarding Plaintiffs' evidence as "hypothetical" and "too factually distinct." *See infra* at 33–38. Although the court acknowledged that the "similarly situated" inquiry is meant to be "flexible, common sense, and factual," the court's analysis was anything but. Plaintiffs presented evidence that Defendants chose not to acknowledge that *puto*—a Spanish-language version of the slur "faggot"—was "profane, disruptive, and abusive" language prohibited by the Code of Conduct but readily agreed that a racist chant was. Plaintiffs also presented admissions from two of Defendants' own employees that they did not provide

security services because of the homophobic content of the chant—one who admitted that different preparations would have been made for a racist chant, and another who refused to address the chant while stating that he would provide services if it were racist. These are direct admissions of differential treatment. And in the public accommodations context, where comparator evidence is all but impossible to come by, it is the most probative evidence available.

If that weren't enough, Plaintiffs also presented evidence of three specific instances of disparate treatment, where fans were ejected from Soldier Field for using "profane, disruptive, or abusive language" in violation of the Code of Conduct. One of these happened at the very same event. All three happened at the same venue and involved the same Defendants enforcing the same Code of Conduct against a language-based violation. These are surely "enough common features . . . to allow a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008); *see also Coleman v. Donahoe*, 667 F.3d 835, 841, 846–52 (7th Cir. 2012) (reasonable jury could infer discrimination when comparator evidence involved "same decisionmaker, subject to the same code of conduct, and disciplined more leniently for violating the same rule"). This Court should hold that Plaintiffs' comparator evidence satisfied the "flexible, common-sense" standard and was enough to show that Defendants treated Plaintiffs differently than similarly situated others.

***Third***, the district court erred in denying Plaintiffs' cross-motion for summary judgment. *See infra* at 38–39. Plaintiffs presented undisputed evidence

establishing each element of their prima facie case. The first two were not contested: Plaintiffs are members of a protected class, and they sought to exercise the right to enjoy Soldier Field. And the district court correctly ruled that the undisputed facts show that Plaintiffs were denied the right to enjoy Soldier Field when Defendants refused to provide them security services. Under the proper legal framework, the uncontested facts (including Defendants' own admissions) also satisfy the fourth and final element—that Defendants treated Plaintiffs differently than similarly situated people outside of their protected class. The burden then shifts to Defendants to provide evidence of an alternative, nondiscriminatory reason for their failure to provide the services Plaintiffs requested. *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("plaintiff is entitled to summary judgment" when defendant presents no "evidence of a noninvidious reason for the adverse action"). Defendants presented nothing of the sort, instead refusing to acknowledge that Plaintiffs were denied anything at all.

## ARGUMENT

This Court reviews the district court's grant of summary judgment de novo. *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019). Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary-judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment:

[the Court] construe[s] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017).

## I. The district court erred in granting Defendants summary judgment because it applied the wrong standard for the "less favorable treatment" element of Plaintiffs' claim.

The district court granted Defendants' summary-judgment motion on the sole basis that Plaintiffs had supposedly failed to identify a "similarly situated" comparator outside their protected class who received more favorable treatment. SA06–8. In doing so, the court imported a rigid framework from employment discrimination cases and applied it inappropriately to Plaintiffs' public accommodations claim arising in a commercial entertainment setting—a context in which the framework makes no practical sense and imposes an artificial evidentiary burden that virtually no plaintiff could satisfy. Had the court applied the right standard and properly considered all the evidence, it would have denied Defendants' motion for summary judgment. This legal error requires reversal.

### A. The district court erred in requiring that Plaintiffs present evidence of a "directly comparable" person whom Defendants in fact treated differently.

The district court applied the wrong standard for assessing claims of discrimination in public accommodations under the IHRA. In the district court's view, for a plaintiff to show that he was "treated less favorably than similarly situated persons," he must present evidence that an "individual" person, "directly comparable to the plaintiff in all material respects," was treated differently by the defendant. SA06–07 (brackets omitted). As explained below, not only does this

"comparator evidence" requirement impose a virtually impossible standard for plaintiffs in the public accommodations context, but it stands in clear tension with this Court's mandate that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. Indeed, far from "liberally constru[ing]" the IHRA "to achieve its purpose"—as Illinois law requires—the district court *strictly* construed the "comparator evidence" requirement so as to *defeat* the statute's purpose. *M.U. by and through Kelley U. v. Team Illinois Hockey Club*, 240 N.E.3d 446, 453 (Ill. 2024) (citing *Sangamon Cnty. Sheriff's Dept. v. Ill. Hum. Rts. Comm'n*, 908 N.E.2d 39 (Ill. 2009)). That error requires reversal.

The district court borrowed its strict "comparator evidence" requirement from the framework used to evaluate claims of *employment* discrimination. *See* SA06 ("In the employment context . . . ." (citing *Fuller v. McDonough*, 84 F.4th 686, 691 (7th Cir. 2023))). But a rule requiring "comparator evidence" cannot translate to claims of discrimination in *public accommodations*, a context in which it is often difficult—if not impossible—to identify sufficiently comparable patrons confronting sufficiently comparable discrimination.

For that reason, courts have rejected the need for strict comparator evidence in the public accommodations setting. In *Christian*, for example, the Sixth Circuit held that a shopper alleging discrimination by a Wal-Mart employee did not have to present evidence of a similarly situated shopper who was treated differently. 252 F.3d at 872. The court acknowledged that it would be impractical to "require a plaintiff to find shoppers who have dealt with the same supervisor, been subject to

the same standards, and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the treatment afforded them." *Id.* at 869 (internal citations omitted). Indeed, the court specifically distinguished the public accommodations context from the employment context, where "decisions are regularized and periodic . . . and by their nature almost always documented." *Id.* at 870 (internal citations omitted). By contrast, in the public accommodations setting, "the clientele is 'largely itinerant' and the task of producing similarly situated persons outside the protected group is much more difficult," making a strict comparator-evidence requirement "particularly onerous," "inflexib[le]," and "sever[e]." *Id.* at 871–72 (citation omitted). So, while evidence of a like comparator may be *one* way a public accommodations plaintiff can show he was treated less favorably because of his protected status, it cannot be the *only* way. *See also Allen v. CLP Corp.*, 460 F. App'x 845, 848 (11th Cir. 2012) (citing *Christian* favorably for this proposition); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006) (finding "the Sixth Circuit's reasoning compelling").

Several district courts have reached the same conclusion, including within this circuit. *See O'Neill v. Gourmet Sys. of Minnesota, Inc.*, 213 F. Supp. 2d 1012, 1020 (W.D. Wis. 2002) (following *Christian* because the "concerns" it identified "are equally compelling in the instant case"); *see also, e.g.*, *Wachuku v. Jet Blue Airways Corp.*, 2021 WL 4497497, at *4 (C.D. Cal.) (concluding that "Plaintiff is not required to identify other similarly situated persons outside her protected group"); *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1354 (N.D. Ga. 2005) (following *Christian*).

The district court in Maryland, for instance, thoughtfully explained why a strict "comparator evidence" requirement has no place in the public accommodations context (there, a restaurant):

> [E]mployment decisions leave behind a paper trail of evidence which to a greater or lesser extent will be available during discovery or otherwise to a discrimination victim. It makes sense, therefore, to insist upon evidence of comparators—similarly situated applicants or employees not in the same protected class—in assessing the strength of the inference of a discriminatory motive which is essential to proof of the claim. In the restaurant context, in contrast, the interactions of a highly mobile public with hostesses, waitpersons and managers are necessarily ad hoc and transient, are almost never with higher-ranking personnel of the enterprise, and are almost never documented in any meaningful sense. Given the ephemeral nature of interpersonal interactions in the public accommodations context, therefore, it may be wholly unrealistic to require a member of the protected class who suffers through what she perceives to be a shockingly discourteous and hostile experience, to identify victims of such outlandishly horrendous service who are not members of the protected class[.]

*Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 706 (D. Md. 2000).

These decisions often arise in the Section 1981 context, to be sure. But they are far more aligned with the facts of this case than *Fuller*—the primary case relied on by the district court here, involving employment discrimination under the Rehabilitation Act of 1973. 84 F.4th at 690–91. In *Fuller*, the Seventh Circuit affirmed dismissal of the plaintiff's differential treatment claim on the ground that other employees were "not comparable to [the plaintiff] in all material respects" because, unlike the plaintiff, they had no disciplinary history. *Id.* at 691. As in all employment discrimination cases, the plaintiff in *Fuller* had the benefit of a small,

concrete pool of employees who worked under the same general conditions and for the same supervisors as the plaintiff. In *that* setting—a closed universe where comparator evidence is so accessible—it might make sense to require it. *See Callwood*, 98 F. Supp. 2d at 706.

A place of public accommodation is different from an employer's office space. *See id.* There are no easily identifiable coworkers to use as comparators, no personnel files, no documented disciplinary histories. Patrons are effectively anonymous. And even if businesses did keep records of which specific patrons raised concerns (a big "if"), they certainly do not keep sterling records of whether or how each complaint was resolved—much less records of each patron's race, sexual orientation, or other personal characteristics that would allow a plaintiff to know who fell outside his protected class. It is next to impossible for any one patron to figure out the identity of other patrons after the fact, let alone to reconstruct with specificity how those other patrons were treated by the defendants. To require Plaintiffs here to identify a specific non-LGBTQ+ "individual" who is "directly comparable in all material respects" to Plaintiffs and who was treated more favorably under similar circumstances is to erect a near-absolute bar on recovery.

These problems are multiplied when the public accommodation at issue is a massive stadium filled with more than 62,000 fans at a sold-out event. Picture a Bears game or Billy Joel concert. How is a plaintiff expected to recreate the circumstances surrounding another patron's request for security services and show that they are sufficiently comparable? At a venue like Soldier Field, fans sitting at

the fifty-yard line or concertgoers shuffling on the field itself may have very different safety needs than a patron in the nosebleeds. Some security services may be offered to guests in pricey box seats that are not offered to patrons in the stands. In sprawling places of public accommodation like this, requiring a plaintiff not only to identify a comparable patron who requested and received security services, but also to show that the circumstances surrounding that request were materially identical to the plaintiff's, is requiring too much.

It gets worse. In many respects, the discrimination at issue here—LGBTQ+ discrimination—can manifest in unique forms. In the same way that cross burning finds no obvious equivalent outside the race-discrimination context, for example, a gay man may face discrimination that finds no obvious parallel in other contexts. That means in public accommodations cases involving LGBTQ+ harassment, there may simply be no "directly comparable" circumstances involving other protected classes. The district court's strict test leaves no room for the possibility that some breeds of discrimination may lack sufficient comparators.

Nor is the district court's test supported by the other cases it cited. *Straw*, like *Fuller*, was not a public accommodations case. 2020 WL 5536728, at *4 ("[T]he Board is not a commercial, recreational, educational, or social service establishment intended to offer goods, services, or accommodations to anyone and everyone."). As in the employment context, *Straw* involved a closed universe of comparators—candidates who did not satisfy the ballot requirements—for the plaintiff to choose from. And the plaintiff in *Straw* "offered no evidence or details" in support of his

claim (*id.* at *7), while Plaintiffs here presented mounds of evidence that they were treated differently than similarly situated others. *See infra* at 33–38.

The district court also cited two cases involving the same pro se plaintiff. SA06–07. But those cases do not address whether exact comparator evidence is required. Instead, the court rejected the plaintiff's claims in both those cases because she presented *no* evidence that she was treated less favorably than similarly situated persons. *See Ellis v. Dept. of Hum. Rts.*, 2020 WL 1082614, at *4 (Ill. App.) (plaintiff "did not present any evidence that Capital One treated similarly situated non-black or non-light-skinned persons more favorably"); *Ellis v. Ill. Hum. Rts. Comm'n*, 2020 WL 2395615, at *3 (Ill. App.) (plaintiff "offered no evidence that her race was a factor" in her alleged mistreatment).

Not only is the district court's exact comparator requirement unsupported by the cases it cited, but it defies this Court's guidance from *Ortiz*. There, this Court made clear that the "sole question that matters" on summary judgment under the IHRA is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [mistreatment]." 834 F.3d at 764–65. In laying out this "straightforward" standard, the Court in *Ortiz* cut through "the rat's nest of surplus 'tests'" and emphasized that the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.* at 765–66. This kind of flexible framework is necessary because discrimination cases "are often factually complex and require sifting through ambiguous pieces of evidence." *Id.*

at 765. That is especially true in the public accommodations context, as explained. *See Christian*, 252 F.3d at 870–71.

*Ortiz* was an employment discrimination case, but that just underscores the point—that a plaintiff alleging discrimination, in an employment context or otherwise, should not be made to crawl through "layers of tests" simply to show that "the evidence would permit a reasonable factfinder to conclude" that the plaintiff was discriminated against due to his protected status. 834 F.3d at 765–66. And this Court has repeatedly reiterated *Ortiz*'s core holding that "[i]n assessing [discrimination claims] at the summary judgment stage," courts must "consider all the evidence in the record, 'eschewing any formula or framework.'" *Palmer v. Indiana Univ.*, 31 F.4th 583, 589 (7th Cir. 2022) (quoting *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021)); *see also David v. Board of Trustees of Cmty. College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). The lower courts have largely heeded this command.[1]

The district court here did not. It embraced precisely the kind of "framework or formula" that this Court has repeatedly rejected. *Palmer*, 31 F.4th at 589. It

---

[1] *See, e.g.*, *Jannsen v. Caine Transfer, Inc.*, 2025 WL 2506887, at *5 (W.D. Wis. Sept. 2, 2025) (evaluating evidence as a whole); *McGrath v. Dunecrest Condo. Ass'n*, 2024 WL 2373391, at *11 (N.D. Ind.) (same); *Phelps v. Ivy Tech Cmty. Coll. of Indiana*, 2024 WL 1056149, at *9 (S.D. Ind.) (same); *Hagen v. Fond Du Lac Sch. Dist.*, 2024 WL 1303331, at *21 (E.D. Wis.) (same); *Whitmore v. Wheaton Vill. Nursing & Rehab. Ctr., LLC*, 2022 WL 1422754, at *3 (N.D. Ill.) (same); *Kelly v. Project of the Quad Cities, Inc.*, 2021 WL 1566444, at *6 (C.D. Ill.) (same); *Darr v. WRB Ref. LP*, 2019 WL 2338507, at *4 (S.D. Ill.) (same).

made proof of a perfect comparator an absolute, dispositive prerequisite. And if the district court's ruling stands, it threatens to "virtually foreclose[] the possibility that a plaintiff could ever successfully raise a . . . disparate treatment claim in the commercial establishment context." *Christian*, 252 F.3d at 872. Indeed, the district court went so far as to fault Plaintiffs for "not identif[ying] any individual or group of individuals who requested security services in response to a similar demonstration at a similar event but who received more favorable treatment or a better response." SA07. In other words, the district court's approach to the IHRA required there to have actually been a KKK demonstration or racist chant that a similarly situated patron actually complained about and that Defendants actually responded to.

That cannot be the law. A discrimination claim should not rise or fall with evidence of perfectly comparable discrimination against other protected groups. Such a requirement would turn the IHRA—a law meant to prevent "unlawful discrimination in public accommodations for all individuals"—on its head. *M.U.*, 240 N.E.3d at 453. So whether or not it is appropriate to require comparator evidence *in the employment discrimination context*, this Court should hold that a discrimination plaintiff *in the public accommodations context* need not offer proof that the defendant treated the plaintiff differently from an "individual" person "directly comparable to the plaintiff in all material respects." SA06 (brackets omitted). And because the district court required exactly that proof, it should be reversed.

### B. Had the district court properly considered all the evidence, it would have denied Defendants' motion for summary judgment.

The district court's error was not harmless. "By holding [Plaintiffs] to the requirement that [they] produce similarly situated persons who were not discriminated against," the district court "foreclos[ed] other methods of proving intentional discrimination." *Christian*, 252 F.3d at 872. If the district court had properly considered the "evidence as a whole," it would have been compelled to deny Defendants' motion for summary judgment. *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 680 (7th Cir. 2012).

Plaintiffs presented ample evidence that they were "treated less favorably than similarly situated persons" on account of their actual or perceived sexual orientation (SA06)—"the sole question that matters" at summary judgment (*Ortiz*, 834 F.3d at 764). To identify just a few facts the district court overlooked or disregarded:

- Paul notified Defendants in advance that Mexico's soccer fans would engage in the chant at the match and requested services to address this homophobic slur. A067, A152.

- As feared, Mexico's fans engaged in large-scale chants at least 28 times during the match and directed additional chants specifically at Plaintiffs numerous times. Dkt. 147-36 ¶ 27; A055, A083–85, A097, A064–65.

- During the match, Plaintiffs spoke to security personnel and requested that Defendants take action against those engaging in the chant, but Defendants refused to provide any security services. A060, A084, A075.

- Defendants refused even to acknowledge that the Code of Conduct's prohibition on "profane, disruptive, or abusive language" extends to homophobic slurs, but they did acknowledge that it applies to racist slurs. A089, A158, A115.

- The chant facially constitutes "profane, disruptive or abusive language." *See* A080; Dkt. 147-33 at 10, 20.

- The Code of Conduct was in force during the match, and Defendants provided security and usher services in response to "profane, disruptive, and abusive" language, but Defendants did not enforce the Code or provide those services in response to the chant. A132–33; Dkt. 147-36 ¶¶ 18–19, 21–22.

- Defendants admitted that if the chant had been racist, they would have provided those services to address it. A103, A071–72, A119–20.

- Defendants admitted to the Chicago Sun Times—almost five years after the 2019 Gold Cup Final and after the depositions in this case—that the chant violates the Code. Dkt. 147-37.

In other words, despite advance warning about the chant and a thorough explanation of what it means for LGBTQ+ patrons, Defendants chose not to provide security services to address it. Despite the chant facially violating their Code of Conduct, they decided to plug their ears and look the other way. Despite the chant thundering through Soldier Field 28 times, they denied Plaintiffs' pleas for security to act against it. But if the chant were *racist*—rather than *homophobic*—they would have prepared and acted differently.

Even if this isn't so-called "comparator evidence"—though much of it is (*see infra* at 33–38)—it is certainly enough to create a genuine dispute, and a reasonable jury could easily infer "a pattern of conduct which is unexplainable on grounds other than [sexual orientation] discrimination." *Ward v. Rush-Presbyterian St. Luke's Med. Ctr.*, 1986 WL 7355, at *7 (N.D. Ill.). The court therefore erred in granting Defendants' motion for summary judgment and should be reversed.

## II. Even if the district court properly required comparator evidence, it still misapplied the standard in granting Defendants summary judgment.

Even if a plaintiff must present comparator evidence to establish a prima facie public accommodations claim, the district court still committed reversible error by rejecting the comparator evidence that Plaintiffs presented here. First, the court improperly rejected comparator evidence about how Defendants would have responded if the chant had been racist rather than homophobic, and second, the court overlooked other substantial comparator evidence in the record.

### A. Defendants' testimony about how they would have responded to racial discrimination shows that Defendants treated Plaintiffs differently on account of sexual orientation.

The district court rejected the deposition testimony of Defendants' own employees—who admitted they would have responded differently to a racist chant—because "[e]vidence about how certain employees would have reacted to a different email or to a different chant or demonstration is at best hypothetical." SA07. In fact, the district court ruled categorically that this kind of testimony "*is not evidence* that Defendants treated similarly situated patrons more favorably than they did the Plaintiffs." *Id.* (emphasis added). This was error.

Defendants' own employees—the very ones responsible for providing security services—admitted in sworn testimony that they would have provided such services in response to a racist chant but did not do so in response to a homophobic one. Moira O'Connor, former Director of Operations at Soldier Field, testified that if a racist chant "was happening at an event and they were made aware of it, there would be a response." A120. Marty McAndrew, an ASM Global assistant general

manager, testified that he would have "listen[ed] to suggestions of ways to curtail a racist chant," "consider[ed] whether to adopt those measures if offered," and "sen[t] a message along to security or police if a patron sent a message that a KKK demonstration was going to happen at an event at Soldier Field." A107. When asked if Defendants would allow racist chants to occur at a Soldier Field event, Kevin Walsh—also an ASM Global assistant general manager—testified that "[i]f we heard something vulgar, we would try to stop it." A103. These are direct admissions of differential treatment based on the type of slur involved—compelling evidence of discrimination based on sexual orientation. It defies reason to suggest that such admissions are "not evidence" that similarly situated, non-LGBTQ+ patrons would have been treated differently in analogous circumstances. SA07.

This type of evidence is some of the most probative evidence available in this kind of case, and Defendants' own admissions about how they would have treated a racist chant are the functional equivalent of comparator evidence where traditional comparators are unavailable. The district court cited no case allowing it to disregard these admissions in a public accommodation setting. If such probative evidence is insufficient as a matter of law, then discrimination at a massive public event could rarely, if ever, be proven. That would eviscerate IHRA protections at every concert, sporting event, festival, and fair. So even if this Court does not entirely eliminate any "comparator evidence" requirement for public accommodations cases, it should hold, at a minimum, that the district court

improperly discarded probative comparator evidence and that Plaintiffs' evidence was sufficient to defeat summary judgment in these circumstances.

### B. The district court disregarded other substantial comparator evidence of discrimination.

The district court also disregarded other evidence that Plaintiffs were treated differently than similarly situated others. Plaintiffs identified three instances when Defendants enforced the Code of Conduct against attendees at Soldier Field for language-based violations. One of these incidents occurred during the 2019 Gold Cup Final itself, where Defendants ejected a fan for using "profane, disruptive, or abusive language" after he told another attendee that he would "kick his ass" and "entice[d] his friends to also harass the victim." A132–33. This confirms that Defendants provided security services to prevent other kinds of verbal harassment at the Gold Cup Final. As for the other two incidents, they also involved patrons who were ejected from Soldier Field for language violations—one in December 2018 for using racist language, and one in January 2019 for making sexual comments toward another patron. Dkt. 147-32, 33 (incident reports).

The district court shot down these comparators as "too factually distinct to allow for a meaningful comparison." SA08. But again, this conclusion misapplies the standard. The similarly situated inquiry is supposed to be "flexible, common sense, and factual," not a "mechanical, 'one-to-one mapping'" between the plaintiff and the comparator. *Coleman*, 667 F.3d at 841. It asks, "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries*, 474 F.3d at 405. The common features are manifest

here: It's the same venue, the same Defendants, the same Code of Conduct, and the same type of conduct (profane or disruptive language). In each of those three instances, Defendants took action. But when fans taunted Plaintiffs with homophobic slurs that equally violated the Code—language that Defendants have since admitted is "abhorrent"—Defendants did not eject a single patron, not even the fans in Plaintiffs' section targeting them directly. Indeed, Defendants chose to permit it despite being asked to address it, both in advance and in the moment.

Especially when combined with Defendants' admissions outlined above, this evidence should have compelled the court to deny Defendants' motion for summary judgment. As this Court explained in *Coleman*, a plaintiff has provided sufficient comparator evidence for purposes of summary judgment when the other incident involved the same decisionmaker, the same standards of conduct, and conduct of comparable seriousness. 667 F.3d at 847–52. Each factor is present here. CPD and ASM Global made the decision to discipline (or not discipline) patrons in each instance. All the fans at Soldier Field in each instance were subject to the standards set out in the Code of Conduct. And despite Defendants' ambivalence, there is no serious dispute that the chant facially violates the Code of Conduct no less than the violations resulting in the ejection of those other three patrons. Indeed, the district court correctly ruled that Plaintiffs were denied the benefit and enjoyment of Soldier Field in part because they were denied "security services, including in the form of Soldier Field's Code of Conduct"—a ruling that presupposes the chant violated the Code. SA05–06.

What's more, despite refusing to do so on the record during discovery, CPD eventually admitted to the media that the chant violates the Code: While this case was pending in the district court, in anticipation of "the nearly sold-out Mexico vs. Bolivia international fútbol match," the CPD issued a statement to the Chicago Sun-Times declaring that "discriminatory chants" are prohibited under the Code and that violations carry "consequences," "including ejection from the stadium, revocation of ticket privileges, civil and/or criminal action." Dkt. 147-37.

In short, Plaintiffs discovered and produced real comparator evidence mirroring their situation in "all material respects." *Coleman*, 667 F.3d at 846. The purpose of such evidence is to give plaintiffs a "boost" in establishing their prima facie case. *Id.* at 852. By demanding more, the district court "transform[ed] this evidentiary 'boost' into an unsurmountable hurdle." *Id.* In fact, it is unclear how the district court determined that these other incidents did not "involve[] anything resembling conduct like the Chant." SA08. The only apparent explanation is that the court believed the large-scale nature of the chant—a mass Code violation—somehow distinguished it from those other violations involving just one or two offenders. SA08 ("given the circumstances of the Chant . . ."). Not so. If anything, the violations in this case were more open and obvious to Defendants. And in any event, Plaintiffs also requested security services to stop the homophobic slurs being hurled at them *specifically* by fans in their section. A055, A083, A085, A097, A064–65. Defendants chose not to enforce the Code against those individuals, despite enforcing it against individuals using racist or sexist language.

The district court overlooked all the material similarities, "focused too much on minor differences," and "was too demanding for purposes of summary judgment." *Coleman*, 667 F.3d at 847. The court should have considered all this evidence "as a whole," with an eye toward the "sole question that matters"—whether any reasonable jury could find that Plaintiffs were treated less favorably because of their actual or perceived sexual orientation. *Ortiz*, 834 F.3d at 764–65. This evidence was more than enough to satisfy this Court's "flexible, common-sense" standard. *Coleman*, 667 F.3d at 841. The district court should be reversed.

## III. The district court erred in denying Plaintiffs' motion for summary judgment.

The district court not only erred in granting Defendants' motion for summary judgment; it also erred in denying *Plaintiffs'* summary-judgment motion.[2] A plaintiff is entitled to summary judgment on a discrimination claim when (1) the plaintiff's evidence establishes the four elements of a prima facie case, and (2) the defendant provides no "evidence of a noninvidious reason for the adverse action." *Stone*, 281 F.3d at 644.

Plaintiffs satisfied each element of their prima facie case of discrimination under the IHRA. The district court correctly concluded that the first three elements were either uncontested or satisfied based on the undisputed facts: Plaintiffs are members of a protected class, they sought to exercise the right to the full benefits

---

[2] "On cross-motions for summary judgment, the party whose motion was denied may appeal as that judgment 'has merged into the final judgment [granting the opposing motion] and is therefore appealable as well.'" *Stilwell v. Am. Gen. Life Ins. Co.*, 555 F.3d 572, 576 (7th Cir. 2009).

and enjoyment of Soldier Field, and they were denied those benefits and enjoyment. And under the proper legal framework explained above, no reasonable jury could find for Defendants on the fourth and final element—that Plaintiffs were treated less favorably than similarly situated persons outside of their protected class.

Defendants' own employees—including those responsible for providing security services—admitted that they would have provided security services in response to a racist chant but did not do so in response to a homophobic one. A120, A107, A103. And it is undisputed that Defendants chose not to enforce the Code of Conduct against patrons engaging in the homophobic chant but did enforce it against patrons engaging in other "profane, disruptive, or abusive language" at Soldier Field. Dkt. 147-36 ¶¶ 18–19, 21–22; Dkt. 147-32, 33. Considering "the summary judgment evidence as a whole," there is no legitimate dispute that Plaintiffs were mistreated because of their protected status. *Good*, 673 F.3d at 680.

Defendants bore the burden to provide evidence of an alternative, "noninvidious reason" for their failure to provide the security services Plaintiffs requested. *Stone*, 281 F.3d at 644. They offered none. In fact, they didn't even try to give a legitimate reason why they failed to provide Plaintiffs with the security services they requested. Instead, they argued that Plaintiffs weren't denied any services at all. But the district court correctly ruled that Plaintiffs *were* denied services, and the absence of any alternative explanation for that denial is dispositive.

For these reasons, summary judgment should have been awarded to Plaintiffs, and the district court erred in concluding otherwise.

## CONCLUSION

For the reasons above, the Court should reverse and remand with instructions to enter judgment for Plaintiffs. If this Court does not reverse the district court's denial of Plaintiffs' summary-judgment motion, it should reverse the grant of summary judgment to Defendants and permit this case to go to a jury.

Dated: July 31, 2026

Respectfully submitted,

/s/ *John E. Drosick*

Terrence J. Dee
John E. Drosick
Samuel M. Zuidema
Veronica J. Sotos
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
(312) 558-5600

*Counsel for Appellants*
*Jordan Penland, et al.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Appellants, furnishes the following in compliance with Federal Rule of Appellate Procedure 32 and Circuit Rule 32:

I hereby certify that this brief conforms to the rules contained in Seventh Circuit Rule 32 for a brief produced with a proportionally spaced font. The length of this brief is 10,217 words.

Dated: July 31, 2026

/s/ *John E. Drosick*

John E. Drosick
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
(312) 558-5600

*Counsel for Appellants*
*Jordan Penland, et al.*

**No. 25-01150**

# United States Court of Appeals for the Seventh Circuit

**JORDAN PENLAND, et al.,**
*Plaintiffs – Appellants*,

**v.**

**CHICAGO PARK DISTRICT and ASM GLOBAL,**
*Defendants – Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 21-cv-05581 (Hon. LINDSAY C. JENKINS)

**APPELLANTS' REQUIRED SHORT APPENDIX**

JOHN E. DROSICK
*Counsel of Record*
TERRENCE J. DEE
SAMUEL M. ZUIDEMA
VERONICA J. SOTOS
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
(312) 558-5600

*Counsel for Appellants*

JULY 31, 2026

**Circuit Rule 30(d) Statement**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix.

Dated: July 31, 2026

/s/ *John E. Drosick*

John E. Drosick
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
(312) 558-5600

*Counsel for Appellants*
*Jordan Penland, et al.*

# INDEX TO REQUIRED SHORT APPENDIX


| Dkt. # | Date | Description | Appendix Page # |
|---|---|---|---|
| 166 | 12/31/2024 | Memorandum Opinion and Order | SA01 |
| 167 | 12/31/2024 | Judgment | SA09 |

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Jordan Penland, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Chicago Park District, *et al.*,<br><br>*Defendants*. | No. 21 CV 5581<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jordan Penland, Karl Gerner, Edward (Ted) Burke, and Paul C. Burke[1] filed this lawsuit in October 2021 and filed the operative Second Amended Complaint in March 2023. [Dkt. 84.] Plaintiffs allege that the Chicago Park District and Soldier Field's Management Company, SMG[2] violated the Illinois Human Rights Act by denying them the full and equal enjoyment of the 2019 Gold Cup Final Soccer Match held at Soldier Field. The parties have filed cross motions for summary judgment. [Dkt. 142, 145.] For the reasons explained below, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion.

## I. Factual Background[3]

Penland, Gerner, and Paul are gay men, and Ted is a heterosexual man. [Dkt. 154 at ¶¶ 1, 3.][4] All the Plaintiffs bought tickets to the Gold Cup Final ("the Match") of the Confederation of North, Central America and Caribbean Association Football between the U. S. Men's National Soccer Team and the Mexico Men's National Soccer Team, which occurred on July 7, 2019, at Soldier Field in Chicago, Illinois. [*Id.* at ¶ 2.] Chicago Park District (CPK) owns Soldier Field and had a contractual relationship with ASM Global/SMG to serve as general manager and operator of Soldier Field. This included responsibility for security and crowd management during

[1] The Court refers to Ted and Paul Burke by first name.

[2] Defendant SMG was served as "ASM Global," and Plaintiffs often use the abbreviation "ASM." The Court uses SMG to reflect the name used by employees of this entity. [Dkt. 147-10 at 10:22–24.]

[3] The Court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed unless otherwise noted.

[4] Ted Burke's sexuality is not explicitly articulated in either parties' Rule 56.1 statement, but it is mentioned in the operative complaint. [Dkt. 84 at ¶ 3.] Ted Burke's sexuality does not impact the application of the IHRA in this case, which protects against discrimination based on actual or perceived sexual orientation. 775 ILCS 5/1-103(Q).

events at Soldier Field. [*Id.* at ¶¶ 4–6.] SMG, in turn, contracted with Monterrey Security, a private entity, to provide security services at Soldier Field for over two decades, including during the Match. [*Id.* at ¶ 9, 11.] Defendants dispute the specific security services SMG was responsible for providing during the Match, but it is undisputed that SMG and its subcontractor provided security services at Soldier Field. [*Id.* at ¶ 10.]

The Chant "*eeeh puto*!" is a homophobic slur and vulgar term for a male sex worker. [*Id.* at ¶ 12.] At matches between the U.S. and Mexican men's national teams in other venues, Plaintiffs had the Chant directed at them, with one instance escalating to physical violence against Paul and Ted Burke. [*Id.* at ¶ 16.] Prior to the Match at Soldier Field, Paul sent identical emails to CPK and SMG warning them about the Chant, outlining its history, and asking Defendants to take steps to "stop homophobic fan misconduct." [*Id.* at ¶ 28.] CPK disputes whether it received the email, but SMG admits that it did. [*Id.* at ¶ 29.] SMG circulated the email to senior managers and outside counsel. [*Id.* at ¶ 34.] Paul never received a response from either Defendant. [*Id.* at ¶ 30.] Other than sending the email to senior managers and outside counsel, SMG did not change any of its normal procedures to address the Chant before the Match. [*Id.* ¶ 37.]

Soldier Field has a Code of Conduct, but the parties dispute who maintains and enforces it. [Dkt. 156 at ¶ 16–19.] Defendants claim to generally prioritize de-escalation services when addressing security incidents at Soldier Field, but Plaintiffs dispute this by pointing to instances when individuals were removed from the stadium for one reason or another. [*Id.* at ¶ 22.] It is undisputed that the Defendants used the same preparations and procedures leading up to the Match as they did for all other events held at Soldier Field in and around 2019. [*Id.* at ¶ 40.]

On the day of the Match, Plaintiffs wore U.S. Men's National Soccer Team Pride Month jerseys to the Gold Cup Final. [Dkt. 154 at ¶ 3.] The rainbow numbering on the back of the jerseys "enabled other attendees, as well as stadium officials, to identify and associate each Plaintiff with the LGBTQ+ community." [*Id.*]

Once the Match began, the Chant occurred at least four times in the first ten minutes. [*Id.* at ¶ 41.] After repeatedly hearing the Chant, Paul sent a text message to the fan security number posted on Soldier Field's website asking officials to "stop this misconduct and enforce the stadium code of conduct." [*Id.* at ¶ 42.] SMG posted an incorrect security number, and its command center did not receive any messages during the Match. [*Id.* at ¶¶ 45–46.] Plaintiffs testified that they felt targeted by the crowd and the people sitting around them who repeated the Chant, and they felt unsafe throughout the Match. [*Id.* at ¶¶ 47–48.] Plaintiffs admit they used the restroom and purchased concessions, but allege they altered their behavior throughout the Match by traveling in pairs or drinking less alcohol because they feared for their safety. [Dkt. 156 at ¶¶ 55–57.] Plaintiffs considered moving seats but

decided against it. [*Id.* at ¶ 61.] Plaintiffs' tickets "did not expressly provide" an option to move sections. [*Id.*]

Paul spoke to an usher or security official during halftime to express disappointment with the inaction to address the Chant. The identity and security-related responsibilities, if any, of the actual person Paul spoke with is unknown (and thus is disputed). [Dkt. 154 at ¶¶ 49, 51.] Defendants admit that the typical protocol for a security official "when confronted with a fan safety issue is to contact a supervisor, which would then be communicated to the Command Center." [*Id.* at ¶ 51.] Ultimately, the Chant occurred 28 times. [*Id.* at ¶ 76.] Plaintiffs stayed at Soldier Field for the entire Match, but say they opted to stay well after the event ended due to safety concerns. [Dkt. 156 at ¶ 68.] There is no evidence of anyone being physically harmed at Soldier Field on the day of the Match due to the Chant. [*Id.* at ¶ 70.]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing cross-motions for summary judgment, all facts and reasonable inferences are construed in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted). But defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## III. Analysis

Under the Illinois Human Rights Act, "[i]t is a civil rights violation for any person on the basis of unlawful discrimination to…[d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." 775 ILCS 5/5-102. Illinois courts have identified that "[a]s remedial legislation, the Act must be liberally construed to achieve its purpose." *M.U. by and through Kelley U. v. Team Illinois Hockey Club*, 240 N.E.3d 446, 453 (Ill. 2024) (citing *Sangamon Cnty. Sheriff's Dept. v. Ill. Hum. Rts. Comm'n*, 557 N.E.3d 39 (Ill. 2009)).

To establish a prima facie public accommodation case, a Plaintiff must show the following: "(1) he is a member of a protected class, (2) he attempted to exercise the right to the full benefits and enjoyment of a place of public accommodation, (3) he was denied those benefits and enjoyment, and (4) he was treated less favorably than similarly situated persons outside of his protected class." *Straw v. Ill. State Bd. Of Elections*, 2020 WL 5536728 at *6 (Ill. App. Ct. Sept. 15, 2020), *appeal denied*, 159 N.E.3d 945 (Ill. 2020).

Here, the parties do not dispute that Plaintiffs are members of a protected class and that they attempted to exercise the full benefits and enjoyment of a place of public accommodation. The parties disagree on the final two prima facie showings: what services Plaintiffs were denied and whether Plaintiffs were treated less favorably than those outside their protected class. The Court considers each below.

### A. Denial of Benefits and Enjoyment

To establish a public accommodation claim, a plaintiff must show that a defendant deprived her of a preexisting good or service; [5] a plaintiff cannot bring a public accommodation case arising from a service a defendant did not provide. *Straw*, 2020 WL 5536728 at *6 ("[G]ranting the accommodations requested by Straw did not fall within the scope of services provided by the Board, and, thus, any denial of those accommodations cannot be considered a denial of the Board's services.") The Illinois Human Rights Commission has identified that "[t]he meaning of full and equal enjoyment encompasses customers being able to fully avail themselves of all services offered by a public place of accommodation." *In the Matter of the Request for Review By: Melissa "Skyler" Hyatt, Petitioner*, 2024 WL 2845071 at *3 (Ill. Hum. Rts. Comm'n May 29, 2024); *see also Hobby Lobby Stores, Inc. v. Sommerville*, 186 N.E.3d 67, 78 (Ill. Ct. App. Aug. 13, 2021).

Plaintiffs argue that they "were denied the full and equal enjoyment of Soldier Field during the 2019 Gold Cup Final because they were subjected to unaddressed and unabated discriminatory conduct targeting them as gay men," including through an increased potential of physical danger. [Dkt. 146 at 13–16.] They maintain that they requested assistance and security services both before and during the Match, but Defendants "provided no crowd management services to address, let alone stop, the Chant." [*Id*. at 14.]

Defendants argue that Plaintiffs were not denied the benefits and enjoyment of a place of public accommodation because they received every good and service they

---

[5] Because the Court concludes there was denial of a service, it does not address Plaintiffs alternative argument—"that public accommodation claims do not necessarily have to include a traditional 'denial of service' requirement." [Dkt. 146 at 20 (citing *Turner g. Wong*, 832 A.2d 340, 345–46 (N.J. Super. Ct. App. Div., 2003); *Kirt v. Fashion Bug | 3253, Inc.*, 479 F.Supp.2d 938, 942–43 (N.D. Iowa 2007).]

contracted for when purchasing tickets—including taking their seats, watching the Match, wearing their jerseys, using the restroom, purchasing concessions, etc.—such that "they were able to access, enjoy and participate in the full experience of" attending the Match. [Dkt. 143 at 22 (citing *Gaylord v. IHRC*, 2020 WL 2791827, at *5 (Ill. App. Ct. 2020) (no discrimination where white woman received services before a Black man because he ultimately received services); *Mallett v. Human Rights Comm'n*, 2021 WL 1856925 (Ill. Ct. App. 2021) (no discrimination arising from a delay rather than a denial of service).] Relying on the Court's prior order at the motion to dismiss stage, (*see* dkt. 77 at 10), Defendants maintain that Plaintiffs' claim necessarily fails because it is premised on the failure to create a service, specifically "that Defendants should have done more" in advance of or in response to the Chant, including by responding to Paul's pre-Match email, responding to his text message to the fan security number, or reprimanding or ejecting fans who participated in the Chant. [Dkt. 143 at 22.]

It is true that many of the relevant Local Rule 56.1 statements are premised on how Defendants should have changed or implemented existing preparation and crowd management strategies in response to Paul's email, text message, and in-person complaints of inaction. For example, Plaintiffs emphasize that Defendants never "had, or modified, its crowd management plan or security services to address the Chant, or even alerted its workforce about the Chant." [Dkt. 146 at 7, Dkt. 154, ¶¶ 37, 38.] They also list more than a dozen crowd management procedures Defendants could have, but did not, implement at the Match. [Dkt. 154, ¶ 78.]

Nevertheless, the core of Plaintiffs' claim is that Defendants failed to provide "security, usher, and Code of Conduct enforcement services, which were all 'existing' services Defendants provided to others at the Match." [Dkt. 163 at 6.] There is no genuine dispute that security services, including in the form of Soldier Field's Code of Conduct, existed at the time of the Match. [Dkt. 154 at ¶¶ 56–59.] As explained in the prior Order, denial of existing services arguably includes the failure to provide existing security services. [Dkt. 77 at 9–10 (explaining that the "denial of a concrete service (such as security) suggests a more traditional claim of disparate treatment discrimination.")]

The Code of Conduct states:

> Unruly or inconsiderate behavior will not be tolerated and may be grounds for ejection from the stadium, revocation of ticket privileges, and subject to civil action and criminal action. Such behavior includes, but is not limited to: intoxication, profane, disruptive or abusive language or gestures, offensive or disorderly conduct, throwing objects, excessive standing in the seating area, smoking anywhere in the stadium, bringing any prohibited items into the stadium, entering or attempting to enter the field level or playing field. [Dkt. 154, ¶ 57.]

It is undisputed that the Code was in effect as of July 2019, and that SMG, through Monterrey, was responsible for its enforcement. [*Id.*, ¶ 57, 59.] The Code established actions officials could take in response to abusive language and offensive or disorderly conduct, including a warning, ejection, revocation of ticket privileges, or arrest. [*Id.* at ¶¶ 58, 59, 67, 70.] Given these undisputed facts, Plaintiffs have demonstrated that they requested but were denied security services and that security was a preexisting service Defendants provided.

### B. Less Favorable Treatment

A public accommodation claim also requires a plaintiff to show that "he was treated less favorably than similarly situated persons outside of his protected class." *Straw*, 2020 WL 5536728 at *6. Plaintiffs argue that they were treated less favorably because Defendants would have enforced the Code differently if the Chant were racist. [Dkt. 146 at 16–18; Dkt. 163 at 15–17.] The Court concludes that Plaintiffs have not met their burden as to this requirement.

Illinois courts look to cases interpreting federal statutes with similar language when evaluating claims under the IHRA. *See M.U. by and through Kelly U.*, 240 N.E.3d at 457 (citing *Zaderaka v. Ill. Hum. Rts. Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989)). In the employment context, a similarly situated individual is "directly comparable to [the plaintiff] in all material respects." *Fuller v. McDonough*, 84 F.4th 686, 691 (7th Cir. 2023) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). At the same time, the inquiry used to identify a similarly situated comparator "is flexible, common-sense, and factual" rather than requiring "a mechanical 'magic formula.'" *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (citing *Coleman v. Donahue*, 667 F.3d 835, 841 (7th Cir. 2012)).

*Straw* is instructive. Straw, a disabled individual seeking to be included as a candidate on a primary ballot for a 2016 Congressional seat, was required to submit a petition for his nomination containing a certain number of eligible voter signatures. *Id*. at *1. After explaining that Straw had not shown that the State Board of Elections denied him the benefits of administering election law services, the court found Straw had not identified any candidate who did not have a disability but was treated better than him. *Id.* at *7. That is, Straw had not identified any individuals who were permitted to appear on the ballot *without* obtaining the required number of signatures. *Id.* at *6–7. *See also Ellis v. Dept. of Hum. Rts.*, 2020 WL 1082614 at *4 (Ill. App. Ct. Jan. 14, 2020) ("Ellis did not present any evidence that Capital One treated similarly situated non-black or non-light-skinned persons more favorably" because "she presented no evidence that other customers outside her protected classes, *i.e.*, persons of a different race or color, were permitted to use the restroom for personal hygiene purposes or were not asked to leave after insulting Capital One employees.") *Ellis v. Ill. Hum. Rts. Comm'n*, 2020 WL 2395615 at *6 (Ill. App. Ct. May

12, 2020) (petitioner "presented no evidence showing that other customers of a different race consigned a pre-owned item with [the consignment shop] and that the item was posted online more quickly than petitioner's handbag or was listed as 'new' when it was not.")

Here, Plaintiffs' primary argument for less favorable treatment relies on the deposition testimony of various CPK, SMG and Monterrey employees and officials who testified they would have reacted differently if the Chant had involved a racial slur—essentially that "a mass racist chant would have been taken seriously." [Dkt. 163 at 12; Dkt. 154 at ¶¶ 68–69, 79; Dkt. 146 at 15–17.] For instance, Plaintiffs point to the testimony of Marty McAndrew who testified that he "would listen to suggestions of ways to curtail a racist chant," "would consider whether to adopt those measures if offered," and "would send a message along to security or police if a patron sent a message that a KKK demonstration was going to happen at an event at Soldier Field." [Dkt. 163 at 12.]

But as Defendants persuasively argue, evidence about how certain employees would have reacted to a different email or to a different chant or demonstration is at best hypothetical. [Dkt. 153 at 13.] It is not evidence that Defendants treated similarly situated patrons more favorably than they did the Plaintiffs.

Plaintiffs offer no support in the case law for a hypothetical comparator like this, and the Court's research has found none. Employee testimony about the response he or she would have had to a racist chant at the Match does not reveal substantial similarity. For example, there is no way to meaningfully compare the email Paul sent in advance of the Match warning of the Chant to a hypothetical email sent to the same employees warning of a racist chant. Nor does the hypothetical comparison eliminate other important variables, such as the circumstances surrounding a racist chant or demonstration, which are needed to isolate discriminatory intent.

Ultimately, the Court cannot see how Plaintiffs' hypothetical comparison satisfies the burden to identify a similarly situated actor outside of the protected class who received more favorable treatment than they did. They have not identified anyone of a different sexual orientation who raised concerns about the Chant but received a better response. Even at a higher level of generality, they have not identified any individual or group of individuals who requested security services in response to a similar demonstration at a similar event but who received more favorable treatment or a better response.

To be sure, Plaintiffs have identified three instances where attendees were removed from Soldier Field for Code of Conduct violations, but none involve similarly situated patrons or similar circumstances. [Dkt. 154 at ¶¶ 67, 70.] Only one instance occurred during the 2019 Gold Cup Final. [*Id.* at ¶ 67.] In that case, a Match attendee

was ejected for "profane, disruptive, or abusive language" after threatening physical violence to other attendees. [*Id.*] Nothing about ejecting this attendee for these violations shows better or more favorable treatment than what Plaintiffs received given the circumstances of the Chant. It simply demonstrates an instance at the Match where the Code of Conduct was enforced.

The other identified instances involving Code of Conduct violations fare no better because they are too factually distinct to allow for a meaningful comparison. One incident from December 2018 concerned a patron who used a racial slur toward another person; the other incident from January 2019 involved a sexual comment directed toward another patron. [*Id.* at ¶ 70.] Neither incident involved anything resembling conduct like the Chant, nor do the parties' submissions provide much in the way of additional details about these incidents. As a result, they do not provide a meaningful comparison or show better treatment of a similarly situated person.

Plaintiffs have not identified any similarly situated individual or individuals outside of their protected class who received more favorable treatment. As such, they have not established evidence from which a jury could reasonably find the fourth prima facie requirement for a public accommodation claim. Because no reasonable fact finder could do so, Defendants are entitled to summary judgment on this claim.[6]

## IV. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion for summary judgment.

Enter: 21-cv-5581
Date: December 31, 2024

Lindsay C. Jenkins
United States District Judge

[6] Defendants also propose an alternate First Amendment theory to support granting summary judgment. As Defendants note, the Supreme Court has stated that "[w]hen a state public accommodations law and the Constitution collide, there can be no question which must prevail." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023). The Court does not reach or evaluate the merits of the Free Speech and forum analysis arguments raised throughout the parties' filings except to note that in the same case, the Supreme Court reiterated its earlier conclusion that "there are no doubt innumerable goods and services that do not require a First Amendment analysis." *Id.* (quoting *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1728 (2018)). The goods and services at issue in this case are not expressive in nature, placing them beyond the ambit of cases involving public accommodation and Free Speech.

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

Jordan Penland, *et al.*,

Plaintiff(s),

v.

Chicago Park District, *et al.*,

Defendant(s).

Case No. 21 CV 5581
Judge Lindsay C. Jenkins

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒ in favor of defendant(s) Chicago Park District and Soldier Field's Management Company, ASM Global

and against plaintiff(s) Jordan Penland, Karl Gerner, Edward R. Burke, and Paul C. Burke

.

Defendant(s) shall recover costs from plaintiff(s).

---

☐ other:

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☒ decided by Judge Lindsay C. Jenkins on a motion.

Date: 12/20/2024

Thomas G. Bruton, Clerk of Court

Claire E. Newman, Deputy Clerk

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all counsel of record on July 31, 2026, via the Court's electronic filing system.

*/s/ John E. Drosick*

*Counsel for Appellants*
*Jordan Penland, et al.*